**[J-43-2024]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

**TODD, C.J., DONOHUE, DOUGHERTY, WECHT, MUNDY, BROBSON, McCAFFERY, JJ.**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 16 MAP 2023 |
| | : | |
| Appellant | : | Appeal from the Order of the |
| | : | Cumberland County Court of |
| | : | Common Pleas, Criminal Division, at |
| v. | : | No. CP-21-CR-3121-2021 dated |
| | : | January 20, 2023 |
| | : | |
| LARRY WARDELL HUNTE, | : | ARGUED: May 15, 2024 |
| | : | |
| Appellee | : | |

**OPINION**

**JUSTICE WECHT**                                      **DECIDED: June 17, 2025**

This direct appeal presents a facial constitutional challenge to Section 3755 of the Vehicle Code.[1] That provision purports to authorize the warrantless seizure of blood samples from a person who requires medical treatment in an emergency room as a result of a motor vehicle accident, where there is probable cause to believe that the person unlawfully drove under the influence of alcohol or a controlled substance. The Court of Common Pleas of Cumberland County in this case declared Section 3755 unconstitutional. We affirm. Section 3755 is facially unconstitutional under the Fourth Amendment to the United States Constitution and Article I, Section 8 of the Pennsylvania Constitution.[2]

---

[1]     75 Pa.C.S. § 3755.

[2]     U.S. CONST. amend IV ("The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be (continued…)

**I.**

The challenged statute provides as follows:

> **(a) General rule.**--If, as a result of a motor vehicle accident, the person who drove, operated or was in actual physical control of the movement of any involved motor vehicle requires medical treatment in an emergency room of a hospital and if probable cause exists to believe a violation of section 3802 (relating to driving under influence of alcohol or controlled substance) was involved, the emergency room physician or his designee shall promptly take blood samples from those persons and transmit them within 24 hours for testing to the Department of Health or a clinical laboratory licensed and approved by the Department of Health and specifically designated for this purpose. This section shall be applicable to all injured occupants who were capable of motor vehicle operation if the operator or person in actual physical control of the movement of the motor vehicle cannot be determined. Test results shall be released upon request of the person tested, his attorney, his physician or governmental officials or agencies.
>
> **(b) Immunity from civil or criminal liability.**--No physician, nurse or technician or hospital employing such physician, nurse or technician and no other employer of such physician, nurse or technician shall be civilly or criminally liable for withdrawing blood or obtaining a urine sample and reporting test results to the police pursuant to this section or for performing any other duty imposed by this section. No physician, nurse or technician or hospital employing such physician, nurse or technician may administratively refuse to perform such tests and provide the results to the police officer except as may be reasonably expected from unusual circumstances that pertain at the time of admission.[3]

Section 3755 is a component of Pennsylvania's "implied consent" scheme, which,

together with Section 1547,[4] is designed to facilitate the investigation and prosecution of

---

violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."); PA. CONST. art. I, § 8 ("The people shall be secure in their persons, houses, papers and possessions from unreasonable searches and seizures, and no warrant to search any place or to seize any person or things shall issue without describing them as nearly as may be, nor without probable cause, supported by oath or affirmation subscribed to by the affiant."). The Fourth Amendment is applicable to the States via the Fourteenth Amendment. *Mapp v. Ohio*, 367 U.S. 643 (1961).

[3] 75 Pa.C.S. § 3755.

[4] *Id.* § 1547.

driving-under-the-influence ("DUI") offenses by requiring motorists to submit to chemical testing in order to measure their blood alcohol concentration ("BAC") and/or the presence of controlled substances in their bodies.[5] As stated expressly in Section 1547(a), the theory underlying the implied consent scheme is that, by electing to drive a vehicle in Pennsylvania, a person "shall be deemed to have given consent" to a search of his or her bodily fluids when a police officer develops "reasonable grounds to believe" that the person has committed a DUI offense.[6] Although Section 1547 allows a person who has been arrested for DUI to refuse a request and mandates that the testing not be conducted against the arrestee's will, the statute discourages refusal by imposing consequences upon the exercise of that right, including driver's license suspension, authorization to use the refusal as evidence of guilt in a future DUI prosecution, and imposition of enhanced criminal penalties upon the refusal to submit to breath testing, but not blood testing.[7]

Section 3755 has been described as the "emergency room counterpart" to Section 1547.[8] Unlike Section 1547, Section 3755 exclusively concerns blood testing, rather than

---

[5]     *See Commonwealth v. Riedel*, 651 A.2d 135, 139-40 (Pa. 1994) (observing that Sections 1547 and 3755 "comprise a statutory scheme that implies the consent of a driver to undergo chemical blood testing under particular circumstances").

[6]     75 Pa.C.S. § 1547(a).

[7]     75 Pa.C.S. § 1547(b)(1) ("If any person placed under arrest for a violation of section 3802 is requested to submit to chemical testing and refuses to do so, the testing shall not be conducted but upon notice by the police officer, the [Department of Transportation] shall suspend the operating privilege of the person . . . ."); *id.* § 1547(e) (providing that in a DUI prosecution, "the fact that the defendant refused to submit to chemical testing as required by subsection (a) may be introduced in evidence along with other testimony concerning the circumstances of the refusal"); *id.* § 1547(b)(2)(ii) (requiring disclosure that "if the person refuses to submit to chemical breath testing, upon conviction or plea for violating section 3802(a)(1), the person will be subject to the penalties provided in section 3804(c) (relating to penalties)").

[8]     *Riedel*, 651 A.2d at 139.  As noted in *Riedel*, Sections 1547 and 3755 originally were contained within the same section of the Vehicle Code, but were separated in a (continued…)

the broader "chemical testing" referenced in Section 1547, which includes breath testing.[9] Section 3755 also provides no right to refuse to submit to a blood draw. Consequently, it also does not concern the imposition of civil or evidentiary consequences of the sort that Section 1547 uses to deter refusal—Section 3755 does not contemplate a refusal to consent at all. On its face, Section 3755 instead purports to authorize the seizure of a person's blood on the basis of probable cause to suspect DUI, without the need for a search warrant or the demonstration of any circumstance-specific exception to the warrant requirements of the Fourth Amendment and Article I, Section 8.

For many years, warrantless blood draws conducted under "implied consent" provisions widely were assumed to be consistent with the requirements of the Fourth Amendment. As discussed in detail below, developments in Fourth Amendment jurisprudence in recent years have revealed the errors of that assumption.

This is not the first time that our Court has considered a constitutional challenge to Section 3755. In *Commonwealth v. Jones-Williams*,[10] the Superior Court considered the constitutionality of this provision under the recent Fourth Amendment jurisprudence developed by the Supreme Court of the United States,[11] and in light of this Court's

---

1982 amendment. *Id.* at 140 n.2 (citing Act of June 17, 1976, P.L. 162, No. 81, § 1; Act of December 15, 1982, P.L. 1268, No. 289, §§ 5, 11).

[9] *Compare* 75 Pa.C.S. § 1547(a) ("chemical tests of breath or blood") *with id.* § 3755 ("emergency room physician or his designee shall promptly take blood samples").

[10] *Commonwealth v. Jones-Williams*, 237 A.3d 528 (Pa. Super. 2020) ("*Jones-Williams I*"), *rev'd*, 279 A.3d 508 (Pa. 2022). Subsequent uses of the short citation form "*Jones-Williams*" will refer to this Court's decision reversing *Jones-Williams I*.

[11] *See Missouri v. McNeely*, 569 U.S. 141 (2013); *Birchfield v. North Dakota*, 579 U.S. 438 (2016); *Mitchell v. Wisconsin*, 588 U.S. 840 (2019) (plurality). Each of these decisions is discussed in detail below.

discussion of the consequences of those federal decisions in *Commonwealth v. Myers*.[12] The Superior Court accordingly held that statutory "implied consent" does not "dispense with the need to obtain a warrant," and, thus, a blood draw conducted under the purported authority of Section 3755 violates the Fourth Amendment and Article I, Section 8 of the Pennsylvania Constitution.[13]  On appeal, this Court concluded that the Superior Court erred in considering the constitutionality of Section 3755 because it was unclear whether Section 3755 applied under the circumstances of that case.[14]  The difficulties in *Jones-Williams* were that hospital personnel had drawn the defendant's blood prior to any request of the investigating officer, that the reason for the blood draw was not established on the record, and that the officer appeared to have believed that he was seeking a blood draw under Section 1547, rather than Section 3755, and filled out a form to that effect.[15] Thus, the *Jones-Williams* Court found it unclear whether Section 3755 was implicated. Invoking principles of constitutional avoidance, the Court accordingly vacated "the portion of the Superior Court's holding deeming Section 3755 unconstitutional."[16]

---

[12]     *Commonwealth v. Myers*, 164 A.3d 1162 (Pa. 2017) (statutory right of refusal under 75 Pa.C.S. § 1547(b)(1) applies to unconscious arrestees).  *Myers* was resolved on statutory grounds, but a plurality consisting of the present author, Justice Donohue, and Justice Dougherty, further opined that "implied consent is not an independent exception to the warrant requirement" under developing Fourth Amendment jurisprudence. *Id.* at 1173-81 (plurality).  Unless otherwise indicated, references to *Myers* herein refer to the portion of that decision that was joined by a plurality of the Court.

[13]     *Jones-Williams I*, 237 A.3d at 542.

[14]     *Jones-Williams*, 279 A.3d at 520 ("Because the record does not establish that Section 3755 applied under these circumstances, the subsequent analysis of the statute's constitutionality should not be addressed.").

[15]     *Id.*  The *Jones-Williams* Court further concluded that the seizure of the previously drawn blood there was not supported by exigent circumstances because the evidence was no longer being metabolized after it was removed from the body.  *Id.* at 518-19.

[16]     The present author, again joined by Justices Donohue and Dougherty, dissented in part in *Jones-Williams*, opining that the constitutionality of Section 3755 was properly (continued…)

The instant case was pending before the trial court when this Court decided *Jones-Williams*. Following our decision, the trial court concluded that the factual impediments noted in *Jones-Williams* were not present in the instant case. The court found Section 3755 to be unconstitutional, thereby placing before us again the question of its constitutionality.

**II.**

On the evening of June 7, 2021, Pennsylvania State Police Troopers German and Gayewski were dispatched to the scene of a single-vehicle accident on Newville Road in West Pennsboro Township. As they approached the scene, the troopers observed a badly damaged vehicle, which appeared to have rolled over several times, leaving a substantial debris field. Among the objects strewn near the vehicle were several fentanyl[17] patches and open containers of alcohol. Two individuals were on the ground nearby, having apparently been ejected from the vehicle during the crash. First responders already were rendering medical aid when the troopers arrived on the scene. The driver was identified as Larry Wardell Hunte. The other individual, Mary Elizabeth Staggs, was determined to have been a passenger in the vehicle. Ms. Staggs ultimately died as a result of her injuries.

A first responder informed the troopers that Hunte had admitted to them that he was the driver of the vehicle and that he had been drinking. Trooper German spoke with Hunte, noting that he appeared dazed and smelled of alcohol. Shortly thereafter, Hunte was transported to Penn State Health Holy Spirit Medical Center for medical treatment.

---

at issue, and that the Superior Court was correct to deem the statute unconstitutional. *See id*. at 521-38 (Wecht, J., concurring and dissenting).

[17] Fentanyl is a synthetic opioid that is classified as a Schedule II controlled substance in Pennsylvania. *See* Section 4(2)(ii)(6) of The Controlled Substance, Drug, Device and Cosmetic Act, Act of April 14, 1972, P.L. 233, *as amended*, 35 P.S. § 780-104(2)(ii)(6).

Trooper German followed, while Trooper Gayewski remained to continue investigating the crash site. When Trooper German arrived at Hunte's bedside in the hospital, Hunte was unconscious. Nonetheless, Trooper German attempted to obtain Hunte's consent to a blood draw, reading to him the warnings provided on the Department of Transportation DL-26B form, which explains the requirements of Section 1547 and the consequences of refusal to submit to a chemical test. Still unconscious, Hunte was unable to respond.

Unable to obtain Hunte's consent to a blood draw, Trooper German proceeded to request that hospital personnel draw Hunte's blood under the authority provided by Section 3755. He did so using a form entitled "Certification of Request for Blood or Urine Alcohol Testing." Echoing the prerequisite for a blood draw under Section 3755, this form required Trooper German to certify only "that a determination of probable cause, that the individual was operating a motor vehicle while under the influence of alcohol or a controlled substance, has been established."[18] After Trooper German submitted this form, a phlebotomist drew two vials of Hunte's blood, without his knowledge or consent. Trooper German later testified to his understanding that this form was predicated upon Section 3755.[19]

---

[18] Hearing, 9/12/2022, Commonwealth's Exhibit 1 (Geisinger Laboratory Medicine, Certification of Request for Blood or Urine Alcohol Testing).

[19] As Trooper German testified on redirect examination:

> Q: Trooper German, you mentioned that the reason for your request was that you believed that the crash was caused by impairment. Was it your understanding that this form was to request blood under Section 3755?

> A: That's correct.

Notes of Testimony, Hearing, 9/12/2022 ("N.T."), at 12. *See also* Commonwealth's Brief In Opposition to Defendant's Omnibus Pretrial Motion, 10/27/2022, at 5 ("In compliance with Section 3755, Holy Spirit Hospital has a specific form for law enforcement to request blood samples be taken. This is the form that was properly used by Trooper German.").

Although the troopers later obtained two different search warrants on the application of Trooper Gayewski—one warrant to take possession of the blood sample from the hospital and a second warrant to have the blood tested[20]—it is undisputed that Trooper German did not possess a search warrant for the blood draw at the time that it was requested and performed. Importantly, the hospital personnel appeared to have drawn Hunte's blood for their own medical purposes prior to Trooper German's request, but this was *not* the blood draw that Trooper German sought and obtained under Section 3755, and it is not the blood that subsequently was tested for investigative purposes. As Trooper German testified:

> Q: Did she only draw blood at your request or was the hospital also doing blood for medical purposes?
>
> A: They had already drew [*sic*] blood for medical purposes.
>
> Q: And then [she] drew a second vial at your request from the form, correct?
>
> A: That's correct.[21]

---

[20] Trooper German testified:

Q: When the blood was drawn pursuant to the form, did you take custody of that blood kit?

A: I did not. She attempted to hand it to me but I told her to take that with her back to her lab, secure it, and [we] were going to be obtaining a search warrant to obtain the blood.

Q: So it was your intention for you or another trooper to get a search warrant to actually take custody of and then test the blood?

A: That's correct.

N.T. at 11.

[21] *Id.* at 10-11. Trooper German further clarified on cross-examination:

Q: How many vials of blood were drawn when you were present?

A: Two vials.

Q: And those were the two vials that you requested the phlebotomist to draw?

(continued…)

Testing of Hunte's blood revealed the presence of both alcohol and controlled substances. Hunte was arrested and charged with homicide by vehicle while driving under the influence, aggravated assault by vehicle while driving under the influence, numerous DUI offenses based upon the amount of alcohol and the type of controlled substances discovered in his blood, numerous summary Vehicle Code violations, and recklessly endangering another person.[22] On February 22, 2022, Hunte filed an omnibus pre-trial motion seeking suppression of the results of the blood testing and dismissal of the charges derived from that testing. The trial court reserved its judgment on the motion pending this Court's decision in *Jones-Williams*. Following our decision in that case, the trial court took up Hunte's challenge to the constitutionality of Section 3755.

The trial court first found that the instant case clearly implicated Section 3755. It was undisputed that Hunte was involved in a motor vehicle accident, that he was the driver of the vehicle, that he was transported to a hospital for emergency medical treatment, that the facts known to Trooper German supported a finding of probable cause to suspect DUI, and that Trooper German requested a blood draw on the basis of that probable cause. Moreover, the trial court opined that the facts could be "readily

A: That's correct.

Q: Mr. Hunte never gave to consent to have those two vials drawn from his person, correct?

A: That's correct.

Q: And you never obtained a warrant to have those two vials of blood drawn from his person?

A: Not drawn.

*Id.* at 11-12.

[22]    *See* 75 Pa.C.S. §§ 3735(a), 3735.1(a), 3802(a)(1), 3802(c), 3802(d)(1)(i), 3802(d)(1)(iii), 3802(d)(2), 3802(d)(3), 3736(a), 3714(b), 3361, 3309(1), 3301(a), 4581(a)(2)(ii), 1515(a); 18 Pa.C.S. § 2705.

distinguished" from the *Jones-Williams* case.[23]  Where the reason for the blood draw in *Jones-Williams* was not fully clear on the record, here, Hunte's blood "was drawn at the request of Trooper German."[24]  Moreover, while the officer in *Jones-Williams* did not mention Section 3755 in his testimony and utilized a form that referenced Section 1547, Trooper German made clear that he proceeded here under Section 3755, and he testified to his understanding that the form that he used was predicated upon Section 3755.  Thus, the trial court reasoned, Section 3755 was squarely implicated, and there existed no non-constitutional basis upon which to rule.[25]

Turning to the constitutionality of Section 3755, the trial court opined that the "law concerning the concept of 'implied consent,' both within and without this Commonwealth, is not a shining model of clarity."[26]  However, relying upon the Supreme Court of the United States' decision in *Birchfield v. North Dakota* and the plurality portion of this Court's decision in *Myers*,[27] the trial court concluded that implied consent statutes may impose certain (non-criminal) consequences upon the refusal to submit to a blood draw, but they do not "create an independent exception to the warrant requirement."[28]  Section 3755, the trial court reasoned, does not concern the imposition of civil or evidentiary consequences upon the refusal to submit, and unlike Section 1547, it provides no right of refusal.  Rather, Section 3755 facially "'authorizes what the Fourth Amendment and

---

[23]    Trial Ct. Op., 1/20/2023, at 3.

[24]    *Id.* at 4.

[25]    The trial court acknowledged that Trooper German first sought to invoke Section 1547 by reading the DL-26B form to the unconscious Hunte, but the court regarded this as "a separate effort," the failure of which "then prompted the Trooper to request the taking of [Hunte's] blood under an alternative authority, *i.e.*, § 3755, as he testified."  *Id.*

[26]    *Id.* at 5.

[27]    *See supra* nn. 11-12.

[28]    Trial Ct. Op., 1/20/2023, at 5.

Article I, Section 8 would prohibit,' *i.e.*, a warrantless search falling within no recognized exception to the usual rule."[29] The trial court further noted that, although this Court in *Jones-Williams* reversed the Superior Court's similar constitutional holding, we did not do so on the merits. Here, the court reasoned, "given the clearer applicability of § 3755 and the absence of any alternative basis for disposition of the case, there is no escaping [Hunte's] constitutional challenge."[30]

The trial court accordingly declared that "75 Pa.C.S. § 3755 violates the Fourth Amendment [to] the Constitution of the United States and Article I, Section 8 of the Constitution of Pennsylvania."[31] In light of this finding, the trial court additionally granted Hunte's motion to dismiss the charges that were premised solely upon the testing of his unconstitutionally obtained blood sample. The Commonwealth sought review of both determinations.[32]

Due to the trial court's declaration that a statute of this Commonwealth is unconstitutional, we exercise direct appellate jurisdiction under Section 722(7) of the

---

[29] *Id.* (quoting *Myers*, 164 A.3d at 1173 (plurality)) (cleaned up).

[30] *Id.*

[31] Order of Court, 1/20/2023.

[32] *See* Pa.R.A.P. 311(d) ("In a criminal case, under the circumstances provided by law, the Commonwealth may take an appeal as of right from an order that does not end the entire case where the Commonwealth certifies in the notice of appeal that the order will terminate or substantially handicap the prosecution.").

Judicial Code.[33]  Also due to that finding, the Office of the Attorney General ("OAG") has submitted a brief in support of the constitutionality of Section 3755.[34]

**III**.

The Commonwealth presents three issues.  The Commonwealth contends that the trial court should not have reached the question of the constitutionality of Section 3755 on the facts of this case, that the search warrants issued after the blood draw took place authorized the seizure of the blood samples, and that the trial court accordingly erred in suppressing the blood test results and in dismissing the charges based thereon.[35]

---

[33]  42 Pa.C.S. § 722(7) ("The Supreme Court shall have exclusive jurisdiction of appeals from final orders of the courts of common pleas in . . . [m]atters where the court of common pleas has held invalid as repugnant to the Constitution, treaties or laws of the United States, or to the Constitution of this Commonwealth, any treaty or law of the United States or any provision of the Constitution of, or of any statute of, this Commonwealth, or any provision of any home rule charter.").

[34]  On May 16, 2024, counsel for the OAG filed an Application for Leave to File Post Submission Communication, explaining that he fell ill before oral argument and was unable to attend.  The OAG thus seeks to supplement its filing with a memorandum summarizing the arguments that the OAG would have presented at oral argument. Although such requests are atypical and we do not grant them as a matter of course, because more argument is better than less where it concerns the constitutionality of a statute, the OAG's Application is granted.  The Court has considered the OAG's written submission.

[35]  As stated in the Commonwealth's brief, the issues presented are:

1.  Whether the Trial Court exceeded its authority when it held 75 Pa.C.S. § 3755 violates the Fourth Amendment [to] the United States Constitution and Article I, Section 8 of the Pennsylvania Constitution, in disregard of clear binding precedent?

2.  Whether the Trial Court erred when it granted [Hunte's] Motion to Suppress evidence despite the Commonwealth's compliance with 75 Pa.C.S. § 3755(a) and its execution of lawfully issued search warrants?

3.  Whether the Trial Court erred when it held the Commonwealth could not establish a *prima facie* case and dismissed several charges against [Hunte] where toxicology results obtained pursuant to a legal search warrant
(continued…)

The Commonwealth stresses the presumption of constitutionality that all statutes enjoy, and emphasizes the weight of a challenger's burden to show that a statute is "clearly, palpably, and plainly" unconstitutional.[36] As for Section 3755, the Commonwealth contends that the warrantless search that it authorizes is permissible because a warrant might be obtained later. On the Commonwealth's reading, the statute concerns the "limited circumstances where emergency room personnel may draw blood, prior to receiving a search warrant," and law enforcement may obtain one later, because "[n]othing in the statute prohibits law enforcement from obtaining a search warrant to seize the blood sample at a later date," as happened here.[37]

The Commonwealth then turns to its assertion that the initial, warrantless blood draw in this case was justified by exigent circumstances.[38] Because Hunte was unconscious at the time of Trooper German's Section 3755 request, the Commonwealth argues that this case is governed by *Mitchell v. Wisconsin*, in which a plurality of the Supreme Court of the United States declared that a DUI suspect's unconsciousness "almost always" will constitute an exigent circumstance justifying a warrantless blood draw.[39] The *Mitchell* plurality further stressed that serious car crashes can create numerous responsibilities for law enforcement, particularly where unconscious drivers are

___

established that Defendant was under the influence of alcohol and a controlled substance?

Commonwealth's Br. at 4. On May 15, 2024, we held oral argument limited to the question: "Whether the trial court properly reached the question of the constitutionality of 75 Pa.C.S. § 3755 and, if so, correctly held it is facially unconstitutional?"

[36]     Commonwealth's Br. at 11 (quoting *Commonwealth v. Ludwig*, 874 A.2d 623, 628 (Pa. 2005)).

[37]     *Id.* at 13-14.

[38]     The Commonwealth did not advance this argument before the trial court.

[39]     *Mitchell*, 588 U.S. at 843 (plurality).

involved. In light of these exigencies, the Commonwealth argues, it was necessary in this case for the troopers to act without a search warrant. The Commonwealth acknowledges that any exigency related to the dissipation of alcohol from the bloodstream would be extinguished *after* a blood sample is obtained and the evidence contained therein is preserved, but because the troopers here obtained a search warrant to take possession of Hunte's blood samples, the Commonwealth argues that the samples were not seized in violation of Hunte's constitutional rights.

In the Commonwealth's view, the troopers complied fully with the requirements of Section 3755, the Fourth Amendment, and Article I, Section 8. Notwithstanding that the statute facially authorizes a warrantless search, the Commonwealth's position is that the search here was not unconstitutional because the blood draw itself was justified by exigent circumstances, and the troopers subsequently obtained a search warrant to take possession of it. Accordingly, the Commonwealth argues that the trial court should not have declared Section 3755 unconstitutional in this case, and it should not have dismissed the related charges.

Hunte stresses that the precedent of both the Supreme Court of the United States and this Court makes clear that a blood draw is an intrusive manner of search that is protected under the Fourth Amendment, and is subject to no categorical exception from the warrant requirement. Section 3755 is unconstitutional, Hunte argues, because it facially authorizes a search on the existence of probable cause alone, without a search warrant or the demonstration of any recognized exception to the warrant requirement.[40] As for the Commonwealth's suggestion that the statute should be spared constitutional scrutiny because it does not *preclude* an officer from obtaining a search warrant sometime

---

[40]     Hunte's Br. at 14-15.

after a blood draw, Hunte deems the argument "frivolous" because such reasoning would defeat all constitutional challenges premised upon the Fourth Amendment.[41]

Hunte suggests that the only conceivable avenue for Section 3755 to survive constitutional scrutiny is a finding that "implied consent" can serve as a standalone exception to the warrant requirement. Hunte argues that such an approach is unsustainable under current Fourth Amendment jurisprudence. He notes, moreover, that neither the Commonwealth nor the OAG make any argument that implied consent is a legitimate basis upon which to uphold Section 3755. Hunte nonetheless proceeds to analyze the suggestion under the current state of the law, contending that implied consent statutes cannot be used as a substitute for the constitutional requirement of a search warrant.[42]

Hunte urges us to reject the Commonwealth's assertion of exigent circumstances. Because this argument is based upon fact-specific considerations, it "has nothing to do with the constitutionality of Section 3755."[43] Moreover, the Commonwealth presented no evidence at the suppression hearing as to whether it would have been practicable to obtain a warrant, and it did not invoke the exigent circumstances doctrine before the trial court. Because the Commonwealth has sought to raise this argument for the first time on appeal, Hunte asserts that it is waived.[44]

---

[41] *Id.* at 18 ("Under that theory all statutes like this one, that permit intrusions without a warrant when one is required would be constitutional. For example, a statute that authorized police, based on probable cause, to enter a house without a warrant and search it would be constitutional because the statute does not prohibit an officer from first obtaining a warrant.").

[42] *Id.* at 19-24, 29-33.

[43] *Id.* at 38.

[44] *Id.* at 40-41; *see* Pa.R.A.P. 302(a) ("Issues not raised in the trial court are waived and cannot be raised for the first time on appeal."). The Commonwealth did not file a (continued…)

Hunte additionally emphasizes that a constitutional analysis should not be concerned with the possibility for some increased burden on law enforcement, but, in any event, the administrative consequences of striking down Section 3755 would not be especially severe. Finally, Hunte argues that, should we find the need to distinguish between the requirements of the Fourth Amendment and Article I, Section 8 on this subject, and should we find that Section 3755 withstands scrutiny under federal law, then we should uphold the trial court's order under the independent protections of the Pennsylvania Constitution. To that end, Hunte provides an analysis of the factors that this Court traditionally considers when deciding whether our Constitution provides greater protection of individual liberty than that of the United States, as discussed in our seminal decision in *Commonwealth v. Edmunds*.[45]

The OAG argues that the trial court should not have reached the constitutionality of Section 3755 because the statute did not apply to this case. The OAG stands alone in this suggestion; both Hunte and the Commonwealth agree that Section 3755 is squarely implicated by the facts of this case.[46] The OAG differs because it appears to be under the impression that the blood sample at issue in this case was taken by hospital personnel for medical purposes prior to Trooper German's request. "Because here blood that had

reply brief, and thus did not respond to Hunte's assertion that its exigent circumstances argument is waived.

[45] *Commonwealth v. Edmunds*, 586 A.2d 887, 895 (Pa. 1991); *see* Hunte's Br. at 33-37.

[46] Commonwealth's Br. at 16 (noting that Trooper German "completed the hospital form and requested blood be drawn pursuant to 75 Pa.C.S. § 3755(a)"); *id.* at 17 ("The parties agree the Commonwealth complied with the statutory scheme set forth by the Motor Vehicle Code; the defendant was involved in a serious crash that rendered him incapable of consent; and the police executed two search warrants to secure and test the blood sample that was obtained pursuant to the request made under § 3755."); Hunte's Br. at 3 ("The Commonwealth agrees with the lower court factual findings that squarely present the issue of the constitutionality of 75 Pa.C.S. § 3755.").

already been drawn was later seized and tested with search warrants," the OAG suggests, "no evidence was obtained by application of the statute."[47]  The OAG thus believes this case to present the same factual impediment as *Jones-Williams*, and it suggests that we should similarly decline to consider the constitutionality of Section 3755. As noted above, Trooper German testified that the hospital staff already had drawn Hunte's blood for medical purposes, but a phlebotomist drew two additional vials of blood pursuant to the trooper's request under Section 3755.[48]  The trial court also plainly found that Hunte's blood "was drawn at the request of Trooper German."[49]  The OAG's constitutional avoidance argument is premised upon a misapprehension of the facts, and we will not address it further.

The OAG concedes that "implied consent" is not a sufficient constitutional basis to uphold Section 3755.[50]  As to the constitutionality of Section 3755, the OAG stresses that a facial constitutional challenge can prevail "only where no set of circumstances exist[s] under which the statute would be valid."[51]  The OAG suggests that Section 3755 can be applied in a constitutional manner in certain circumstances, and thus cannot be deemed facially unconstitutional.  Like the Commonwealth, the OAG stresses that Section 3755 does not *preclude* a search warrant.  Should a search warrant be obtained, the OAG suggests, then the application of the statute would not be unconstitutional in that

---

[47]     OAG's Br. at 12.

[48]     *See supra* pp.7-8; N.T. at 10-12.

[49]     Trial Ct. Op., 1/20/2023, at 4.

[50]     OAG's Br. at 10 (acknowledging that "implied consent is not a warrant exception").

[51]     *Id*. at 8 (quoting *Commonwealth v. Pownall*, 278 A.3d 885, 904 (Pa. 2022)).

instance.[52]  In a similar vein, the OAG argues that the situation to which Section 3755 applies—an intoxicated driver requiring medical treatment at a hospital—often will be deemed to be an exigent circumstance that would dispense with the requirement of a search warrant.  Like the Commonwealth, the OAG emphasizes the *Mitchell* plurality's discussion of the factors that commonly establish exigent circumstances in unconscious-driver scenarios.  The OAG suggests that such exigent circumstances also constitute situations in which Section 3755 may be applied lawfully.  Thus, because there are circumstances in which Section 3755 could be applied validly, the OAG argues that the statute is not facially unconstitutional.

**IV**.

The constitutionality of a statute is a pure question of law, over which our standard of review is *de novo* and our scope of review is plenary.[53]  Statutes enjoy a presumption of constitutionality, and challengers bear the burden to establish that their provisions "clearly, plainly, and palpably" violate the Constitution.[54]  "A statute is facially unconstitutional only where no set of circumstances exist[s] under which the statute would be valid."[55]  Facial constitutional challenges to statutes under the Fourth Amendment "are

---

[52]  *Id.* at 10 ("Here, as the lower court observed, implied consent is not a warrant exception, and while the statute requires probable cause, it does not require a warrant.  But neither does it preclude one.  Where the police do obtain a warrant, applying § 3755 would be constitutional.") (internal citation omitted).

[53]  *Commonwealth v. Torsilieri*, 316 A.3d 77, 86 (Pa. 2024) (citing *Commonwealth v. LaCombe*, 234 A.3d 602, 608 (Pa. 2020)).

[54]  *Pennsylvania Env't Def. Found. v. Commonwealth*, 279 A.3d 1194, 1202 (Pa. 2022).

[55]  *Pownall*, 278 A.3d at 904 (quoting *Clifton v. Allegheny Cty.*, 969 A.2d 1197, 1222 (Pa. 2009)) (brackets in original); *see also United States v. Salerno*, 481 U.S. 739, 745 (1987).

not categorically barred or especially disfavored."[56]   Moreover, although a facial challenger must establish that a statute is unconstitutional in all of its applications, we are concerned only with "applications of the statute in which it actually authorizes or prohibits conduct."[57]   Particularly in the Fourth Amendment context, "when addressing a facial challenge to a statute authorizing warrantless searches, the proper focus of the constitutional inquiry is searches that the law actually authorizes, not those for which it is irrelevant."[58]

Under both the Fourth Amendment to the United States Constitution and Article I, Section 8 of the Pennsylvania Constitution, searches conducted in the absence of a search warrant are *per se* unreasonable, unless they satisfy one of the recognized exceptions to the warrant requirement.[59]   One such exception exists when a person consents to the search.  Such consent must be "voluntarily given, and not the result of duress or coercion, express or implied," and voluntariness is a "question of fact to be determined from all the circumstances."[60]   The other exception of potential relevance to

---

[56]     *City of Los Angeles, Calif. v. Patel*, 576 U.S. 409, 415 (2015).

[57]     *Id.* at 418.

[58]     *Id.*

[59]     *See Katz v. United States*, 389 U.S. 347, 357 (1967) ("Over and again this Court has emphasized that the mandate of the Fourth Amendment requires adherence to judicial processes, and that searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment— subject only to a few specifically established and well-delineated exceptions.") (cleaned up; citations omitted); *Commonwealth v. Lyons*, 79 A.3d 1053, 1063-64 (Pa. 2013) ("Under the federal and state constitutional prohibitions of unreasonable searches and seizures, both the United States Supreme Court and this Court have consistently held that, subject to certain exceptions, a search is constitutionally invalid unless it is conducted pursuant to a warrant issued by a neutral and detached magistrate and supported by probable cause.").

[60]     *Schneckloth v. Bustamonte*, 412 U.S. 218, 248-49 (1973); *see also Bumper v. North Carolina*, 391 U.S. 543, 548 (1968).

Section 3755 is that provided for exigent circumstances, under which the need for a warrant may be excused "when the exigencies of the situation make the needs of law enforcement so compelling that a warrantless search is objectively reasonable under the Fourth Amendment."[61] Exigent circumstances are established through a showing that "there is compelling need for official action and no time to secure a warrant."[62] Like the voluntariness of consent, the presence of exigent circumstances is a case-by-case assessment to be determined through consideration of the totality of the circumstances.[63]

Section 3755(a) facially purports to authorize the taking of "blood samples" on the basis of probable cause to suspect DUI. As discussed below, this physical intrusion into the body constitutes a search under the Fourth Amendment. Section 3755, however, requires neither a search warrant nor the assertion of any case-specific exception to the warrant requirement. Rather, Section 3755(a) mandates that the blood draw be conducted and the samples transmitted for testing, and provides that the "[t]est results shall be released upon request" of, among others, "governmental officials or agencies."[64] Because Section 3755 authorizes warrantless searches for an entire category of cases, its constitutionality under the Fourth Amendment is facially suspect. Section 3755 can

---

[61]     *McNeely*, 569 U.S. at 148-49 (quoting *Kentucky v. King*, 563 U.S. 452, 460 (2011)).

[62]     *Id.* at 149 (quoting *Michigan v. Tyler*, 436 U.S. 499, 509 (1978)); *see also Mitchell*, 588 U.S. at 849 (plurality) (quoting *McNeely*, 569 U.S. at 149); *Commonwealth v. Trahey*, 228 A.3d 520, 530 (Pa. 2020) (same).

[63]     *See McNeely*, 569 U.S. at 149; *id.* at 150 (absent a warrant, "'the fact-specific nature of the reasonableness inquiry' demands that we evaluate each case of alleged exigency based 'on its own facts and circumstances'") (quoting *Ohio v. Robinette*, 519 U.S. 33, 39 (1996); *Go-Bart Importing Co. v. United States*, 282 U.S. 344, 357 (1931)); *Birchfield*, 579 U.S. at 467 (exigent circumstances exception "always requires case-by-case determinations"); see *also Lange v. California*, 594 U.S. 295, 301-02 (2021).

[64]     75 Pa.C.S. § 3755(a). As discussed below, Section 3755(b) further mandates that hospital personnel perform the blood draws addressed in subsection (a), and provides them with criminal and civil immunity in connection with those blood draws. *See id.* § 3755(b).

stand only if there is some reason that the searches that it mandates can fall into some recognized exception to the warrant requirement.

As a threshold matter, we conclude that the constitutionality of Section 3755 is properly at issue in this appeal. Unlike in *Jones-Williams*, it is clear that the challenged blood draw was conducted here under the authority of Section 3755. Trooper German initially sought to invoke Section 1547 in order to obtain Hunte's submission to a blood draw, but the unconscious Hunte was unable to make a "knowing and conscious choice" between submission and acceptance of the statutory consequences of refusal.[65] Unable to rely upon Section 1547, Trooper German then invoked Section 3755 by filling out and submitting to hospital personnel a form undisputedly based upon and tailored to the requirements of that statute. Trooper German testified to his understanding that his actions were authorized by Section 3755, and the trial court found as a fact that the challenged blood sample "was drawn at the request of Trooper German" pursuant to Section 3755.[66] Regardless of whether medical personnel had drawn Hunte's blood for another reason prior to that request, the fact that the challenged blood draw was conducted under the auspices of Section 3755 brings the application and constitutionality of Section 3755 squarely into focus. Relatedly, and as discussed further below, although one might assert that certain extra-statutory evidentiary showings potentially could render a search lawful under the facts of a particular case, such theoretical alternatives do not preclude a facial constitutional challenge to a statute that clearly applied on its own terms.

---

[65]     *See Myers*, 164 A.3d at 1171-72 (Majority holding).

[66]     Trial Ct. Op., 1/20/2023, at 4.

With the constitutionality of Section 3755 properly before us, we turn to an analysis of the developments in Fourth Amendment jurisprudence that resolve the question.[67]

## A. *McNeely*, *Birchfield*, and *Mitchell*

An intrusion into the human body for the purpose of obtaining a blood sample is a search within the meaning of the Fourth Amendment.[68] Although the Supreme Court of the United States earlier had rejected a constitutional challenge to a warrantless blood draw under the Due Process Clause of the Fourteenth Amendment,[69] the Court reconsidered the matter under the Fourth Amendment in *Schmerber v. California*. The *Schmerber* Court ruled that compulsory blood draws in DUI cases are searches under the Fourth Amendment, triggering the protections of the Fourth Amendment's warrant requirement. Nonetheless, the *Schmerber* Court reasoned that the warrantless blood draw at issue was reasonable under the exigent circumstances doctrine. The Court noted that, because the defendant's body was naturally metabolizing the alcohol in his bloodstream, and due to the time necessary to transport the defendant and to investigate the crash scene, the officer "might reasonably have believed that he was confronted with

---

[67]     Although Hunte's analysis of the greater privacy guarantees afforded under Article I, Section 8 is well-taken, we find it unnecessary to reach the question of whether the Pennsylvania Constitution provides additional protection in this context. Because the Supreme Court of the United States' elaboration of Fourth Amendment principles is sufficient to resolve the matter, we leave that question for another day.

[68]     *See Schmerber v. California*, 384 U.S. 757, 767 (1966) (the "compulsory administration of a blood test . . . plainly involves the broadly conceived reach of a search and seizure under the Fourth Amendment"); *Birchfield*, 579 U.S. at 455 (citing *Skinner v. Railway Labor Executives' Assn.*, 489 U.S. 602, 616-17 (1989); *Schmerber*, 384 U.S. at 767-68 (1966)) ("[O]ur cases establish that the taking of a blood sample or the administration of a breath test is a search."); *see also Trahey*, 228 A.3d at 530.

[69]     U.S. CONST. amend. XIV, § 1; *see Breithaupt v. Abram*, 352 U.S. 432, 435-40 (1957) (involuntary blood draw did not offend due process).

an emergency, in which the delay necessary to obtain a warrant, under the circumstances, threatened 'the destruction of evidence.'"[70]

Although *Schmerber* facially stated its holding in case-specific terms, the Court's decision widely was read as approving a categorical exception to the warrant requirement for blood testing in DUI investigations, premised upon the destruction of evidence arising from the natural dissipation of alcohol from one's bloodstream.[71] This impression likely was fostered by a comment in *South Dakota v. Neville*, in which the Court stated, albeit in the Fifth Amendment[72] context, that *Schmerber* "clearly allows a State to force a person suspected of driving while intoxicated to submit to a blood alcohol test."[73] This categorical understanding of the *Schmerber* case was prevalent until 2013, when *McNeely* began to develop the new body of Fourth Amendment jurisprudence that substantially has altered the understanding of the constitutional requirements for the search and seizure of bodily fluids in DUI investigations.[74]

---

[70] *Schmerber*, 384 U.S. at 770 (quoting *Preston v. United States*, 376 U.S. 364, 367 (1964)).

[71] *See, e.g.*, *McNeely*, 569 U.S. at 147 n.2 (collecting cases); *State v. Reynolds*, 504 S.W.3d 283, 305-06 (Tenn. 2016) (discussing state court interpretations of *Schmerber*).

[72] U.S. CONST. amend. V.

[73] *S. Dakota v. Neville*, 459 U.S. 553, 559 (1983). *Neville* held that the admission into evidence of a defendant's refusal to submit to a BAC test did not violate the defendant's Fifth Amendment right against self-incrimination. *Id.* at 554. *Neville* did not concern the Fourth Amendment.

[74] This Court has, in previous decisions, discussed the developments in Fourth Amendment law ushered in by *McNeely*, *Birchfield*, and *Mitchell*. *See, e.g.*, *Jones-Williams*, 279 A.3d at 518; *Trahey*, 228 A.3d at 531-35; *Commonwealth v. Starry*, 224 A.3d 312, 320 (Pa. 2020); *Commonwealth v. Olson*, 218 A.3d 863, 869-70, 872-75 (Pa. 2019); *Commonwealth v. Bell*, 211 A.3d 761, 771-76, 775 n.13 (Pa. 2019); *Myers*, 164 A.3d at 1178-80 (plurality). Because *McNeely*, *Birchfield*, and *Mitchell* are central to the constitutionality of Section 3755, we discuss these decisions in detail once again.

*McNeely* concerned the question of "whether the natural dissipation of alcohol in the bloodstream establishes a *per se* exigency that suffices on its own to justify an exception to the warrant requirement for nonconsensual blood testing in drunk-driving investigations."[75] Answering that question in the negative, the *McNeely* Court stressed the case-specific nature of the assessment of exigent circumstances,[76] and emphasized that *Schmerber* did not purport to state a categorical rule; rather, "*Schmerber* applied this totality of the circumstances approach."[77]

The *McNeely* Court acknowledged that the human body naturally metabolizes alcohol, such that BAC evidence will gradually dissipate over time. This did not, in the Court's view, justify a categorical authorization for warrantless blood draws. "In those drunk-driving investigations where police officers can reasonably obtain a warrant before a blood sample can be drawn without significantly undermining the efficacy of the search, the Fourth Amendment mandates that they do so."[78] Although the dissipation of BAC evidence could contribute to a finding of exigency in certain cases, the *McNeely* Court reasoned that this was merely "a reason to decide each case on its facts, as we did in *Schmerber*, not to accept the 'considerable overgeneralization' that a per se rule would reflect."[79] The Court additionally commented that blood testing differs from other "now or

---

[75]    *McNeely*, 569 U.S. at 147. Although *McNeely* is a plurality decision in part, unless otherwise noted, the cited portions of *McNeely* are sourced from the portions of the Court's opinion that received the joinder of a majority of the Justices.

[76]    *Id.* at 149-50.

[77]    *Id.* at 150; *see also id.* at 151 ("[O]ur analysis in *Schmerber* fits comfortably within our case law applying the exigent circumstances exception. In finding the warrantless blood test reasonable in *Schmerber*, we considered all of the facts and circumstances of the particular case and carefully based our holding on those specific facts.").

[78]    *Id.* at 152 (citing *McDonald v. United States*, 335 U.S. 451, 456 (1948)).

[79]    *Id.* at 153 (quoting *Richards v. Wisconsin*, 520 U.S. 385, 393 (1997)).

never" situations involving the destruction of evidence because the suspect has no control over the dissipation of BAC evidence, which occurs naturally, gradually, and predictably.[80] Moreover, the *McNeely* Court reasoned, suspects typically must be transported to a medical facility for blood testing, which inherently involves some delay, and there can be circumstances "in which the warrant process will not significantly increase the delay before the blood test is conducted because an officer can take steps to secure a warrant while the suspect is being transported to a medical facility by another officer."[81] In such a situation, "there would be no plausible justification for an exception to the warrant requirement."[82]

Moreover, the *McNeely* Court reasoned that a *per se* rule "fails to account for advances in the 47 years since *Schmerber* was decided that allow for the more expeditious processing of warrant applications, particularly in contexts like drunk-driving investigations where the evidence offered to establish probable cause is simple."[83] The Court stressed that federal criminal procedural rules allow for the use of telephonic warrants, and that most States authorize the use of various technologies to allow police officers to obtain search warrants remotely while in the field.[84] The *McNeely* Court acknowledged that there is always some amount of delay attendant to a search warrant application. "But technological developments that enable police officers to secure warrants more quickly, and do so without undermining the neutral magistrate judge's

---

[80]     *Id.*

[81]     *Id.*

[82]     *Id.* at 153-54.

[83]     *Id.* at 154.

[84]     *Id.* at 154-55; *see* Pa.R.Crim.P. 203(a) ("In the discretion of the issuing authority, advanced communication technology may be used to submit a search warrant application and affidavit(s) and to issue a search warrant.").

essential role as a check on police discretion, are relevant to an assessment of exigency."[85]

In light of these considerations, *McNeely* held "that in drunk-driving investigations, the natural dissipation of alcohol in the bloodstream does not constitute an exigency in every case sufficient to justify conducting a blood test without a warrant."[86]  The Court further explained that, "while the natural dissipation of alcohol in the blood may support a finding of exigency in a specific case, as it did in *Schmerber*, it does not do so categorically.  Whether a warrantless blood test of a drunk-driving suspect is reasonable must be determined case by case based on the totality of the circumstances."[87]

To those who understood *Schmerber* as providing a categorical exception to the warrant requirement for BAC testing, *McNeely* caused a bit of a stir.  With the exigent circumstances doctrine unable to support a *per se* rule, a categorical exception quickly was sought, and soon granted, under another exception to the warrant requirement—the search-incident-to-arrest doctrine.[88]  This rule, however, would come with a caveat: warrants are categorically excused only for breath testing, not for blood draws.

---

[85]     *McNeely*, 569 U.S. at 155.

[86]     *Id.* at 165.

[87]     *Id.* at 156.  Some additional portions of *McNeely* were not joined by a majority of Justices, with those in a partially concurring posture primarily differing over the degree of guidance that the Court should provide for typical DUI cases.  *See id.* at 165-66 (Kennedy, J., concurring in part); *id.* at 175 (Roberts, C.J., concurring in part and dissenting in part) ("I believe more meaningful guidance can be provided about how to handle the typical cases, and nothing about the question presented prohibits affording that guidance.").  As is later significant to the *Mitchell* case, Justice Thomas dissented in *McNeely*, contending that the loss of evidence caused by metabolization of alcohol should be deemed to be an exigent circumstance as a categorical matter.  *See id.* at 176-83 (Thomas, J., dissenting).

[88]     *See Birchfield*, 579 U.S. at 458-61 (discussing, *inter alia*, *Chimel v. California*, 395 U.S. 752 (1969); *United States v. Robinson*, 414 U.S. 218 (1973); *Riley v. California*, 573 U.S. 373 (2014)).

The question in *Birchfield* concerned "implied consent" laws, which the Court characterized as statutes that "impose penalties on motorists who refuse to undergo testing when there is sufficient reason to believe they are violating the State's drunk-driving laws."[89] The Court specifically considered three consolidated cases that involved the imposition of *criminal* penalties for refusal to undergo BAC testing, over and above the typical penalties of driver's license suspension and use of the refusal as evidence at trial. Because implied consent laws concern searches under the Fourth Amendment, the *Birchfield* Court reasoned that criminal punishment only may be imposed if the searches that they contemplate are lawful, "just as a State may make it a crime for a person to obstruct the execution of a valid search warrant."[90] Absent a lawful search, a State could not criminalize the refusal to submit thereto.

The relevant inquiry, *Birchfield* concluded, was whether the breath or blood tests demanded by implied consent laws may be deemed lawful as a categorical matter under the search-incident-to-arrest exception. After a detailed historical discussion of that doctrine, the *Birchfield* Court emphasized precedents holding that the fact of a lawful arrest authorizes "a full search of the person," and that this authority is categorical, *i.e.*, there is no case-by-case assessment of the need for a search incident to arrest.[91] In *Riley v. California*, moreover, the Court made clear that, when considering the applicability of the search-incident-to-arrest doctrine to novel situations that could not have been envisioned when the Fourth Amendment was adopted, the inquiry requires an assessment of, "on the one hand, the degree to which [the search] intrudes upon an

---

[89]     *Id.* at 444.

[90]     *Id.* at 455.

[91]     *Id.* at 460 (quoting *United States v. Robinson*, 414 U.S. 218, 235 (1973)).

individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests."[92]

Applying this standard to the tests at issue, the *Birchfield* Court arrived at its central holding—a constitutional line drawn between breath testing and blood testing, based upon the degree to which each form of testing intrudes upon individual privacy interests. Breath testing, the Court reasoned, does not "implicat[e] significant privacy concerns."[93] Breath testing requires no penetration of the subject's skin, is minimally inconvenient or embarrassing, painless, collects nothing that the body does not discard naturally through breathing, and reveals only one piece of information—the subject's BAC.[94] "Blood tests are a different matter."[95] Blood tests require piercing the skin and extracting a part of the subject's body, which is not freely discarded otherwise. "It is significantly more intrusive than blowing into a tube."[96] Moreover, blood testing involves the collection of a sample that can be kept and preserved, and from which much more information can be gleaned about the subject than a mere BAC reading. Blood tests, the *Birchfield* Court thus held, are a much more significant intrusion upon individual privacy interests than breath tests.

Because the governmental interest in obtaining BAC evidence from drunk drivers is strong, and because implied consent laws that incentivize drivers to provide such evidence "serve a very important function," the *Birchfield* Court concluded that a

---

[92]   *Id.* at 460-61 (quoting *Riley v. California*, 573 U.S. 373, 385 (2014)).

[93]   *Id.* at 461 (quoting *Skinner*, 489 U.S. at 626).

[94]   *Id.* at 461-63.

[95]   *Id.* at 463.

[96]   *Id.* at 464.

categorical authorization for some form of BAC testing was warranted under the search-incident-to-arrest doctrine.[97]  The Court concluded:

> Having assessed the effect of BAC tests on privacy interests and the need for such tests, we conclude that the Fourth Amendment permits warrantless breath tests incident to arrests for drunk driving. The impact of breath tests on privacy is slight, and the need for BAC testing is great.
>
> We reach a different conclusion with respect to blood tests. Blood tests are significantly more intrusive, and their reasonableness must be judged in light of the availability of the less invasive alternative of a breath test. Respondents have offered no satisfactory justification for demanding the more intrusive alternative without a warrant.[98]

The *Birchfield* Court then considered and rejected several of the arguments in favor of authorizing warrantless blood testing as well.  Blood testing, the Court noted, allows the detection not just of alcohol, but also of controlled substances.  But where law enforcement officers suspect drug-based intoxication, "[n]othing prevents the police from seeking a warrant for a blood test when there is sufficient time to do so in the particular circumstances or from relying on the exigent circumstances exception to the warrant requirement when there is not."[99]  Unlike breath tests, blood tests can be performed upon unwilling suspects, but the Court noted that state laws often decline to authorize blood draws over a suspect's resistance, seeking to minimize the risk of violent altercations.  Breath tests might be foiled by a suspect deliberately attempting to blow an inadequate sample, but the Court noted that such conduct generally constitutes refusal and, under the Court's holding, can be prosecuted as such.  Finally, and significantly, the Court noted

---

[97]     *Id.* at 466.

[98]     *Id.* at 474.

[99]     *Id.* at 474-75 (citing *McNeely*, 569 U.S. at 165); *see also Trahey*, 228 A.3d at 536-39 (finding exigent circumstances lacking for warrantless blood draw sought to investigate presence of controlled substances, which did not present the same concerns regarding the speed of metabolization of BAC evidence).

that blood tests can be performed upon unconscious persons. But the Court found "no reason to believe that such situations are common in drunk-driving arrests, and when they arise, the police may apply for a warrant if need be."[100]

Although *Birchfield*'s distinction between breath and blood is quite clear, its final holding was more ambiguous. Having concluded that warrantless blood draws are not categorically authorized under the search-incident-to-arrest doctrine, the Court turned to the government's alternative argument "that such tests are justified based on the driver's legally implied consent to submit to them."[101] The argument was that "implied consent" laws can dispense with the Fourth Amendment's warrant requirement on their own authority, due to a statutory declaration that drivers are deemed to have given consent to searches of their bodily fluids by virtue of their decision to drive on public roads. The *Birchfield* Court did not confront that suggestion directly; rather, the Court narrowed its focus to the precise question before it, *i.e.*, whether DUI arrestees "may be convicted of a crime or otherwise penalized" for refusing to submit to a warrantless BAC test.[102] The Court noted that consent is a valid exception to the warrant requirement, that a search is reasonable when the subject consents, and that consent can be inferred from context in certain circumstances.[103] The Court then stated:

> Our prior opinions have referred approvingly to the general concept of implied-consent laws that impose civil penalties and evidentiary consequences on motorists who refuse to comply. *See, e.g.*, *McNeely*, 569 U.S. at 160-161 (plurality opinion); *Neville*, 459 U.S. at 560. Petitioners do not question the constitutionality of those laws, and nothing we say here should be read to cast doubt on them.

---

[100] *Birchfield*, 579 U.S. at 475.

[101] *Id.* at 476.

[102] *Id.* at 454.

[103] *Id.* at 476 (citing *Schneckloth*, 412 U.S. at 218; *Florida v. Jardines*, 569 U.S. 1, 8 (2013); *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 313 (1978)).

It is another matter, however, for a State not only to insist upon an intrusive blood test, but also to impose criminal penalties on the refusal to submit to such a test. There must be a limit to the consequences to which motorists may be deemed to have consented by virtue of a decision to drive on public roads.[104]

Thus arriving at its holding regarding implied consent, the *Birchfield* Court declared "that motorists cannot be deemed to have consented to submit to a blood test on pain of committing a criminal offense."[105] Applying its holding to the three consolidated cases before it, the Court concluded that it was permissible to criminally punish the petitioner who refused a breath test because such was a lawful search incident to arrest, but it was unlawful to criminally punish the petitioner who refused a blood test, which was not justified by any exception to the warrant requirement. The third petitioner, Beylund, submitted to a blood test after he was warned of the consequences of refusal. The state court had reasoned that this petitioner's "consent was voluntary on the erroneous assumption that the State could permissibly compel both blood and breath tests."[106] Significantly, the Court's remand instruction for Beylund's case provided: "Because voluntariness of consent to a search must be 'determined from the totality of all the circumstances,' *Schneckloth*, 412 U.S. at 227, we leave it to the state court on remand to reevaluate Beylund's consent given the partial inaccuracy of the officer's advisory."[107]

The *Birchfield* Court thus limited its holding to a declaration that it is unlawful to impose *criminal* penalties for refusal to submit to a warrantless blood test. The narrowness of this holding plainly left open the more fundamental question: whether implied consent provisions can serve as an independent authorization for a warrantless

---

[104]    *Id.* at 476-77 (citations modified).

[105]    *Id.* at 477.

[106]    *Id.* at 478.

[107]    *Id.* (citation modified).

search in the first place, *i.e.*, whether a state legislature actually can waive the constitutional rights of all drivers by statutory declaration. The Court set out to provide an answer to that question in *Mitchell*, granting *certiorari* to decide "[w]hether a statute authorizing a blood draw from an unconscious motorist provides an exception to the Fourth Amendment warrant requirement."[108]

When the Court decided *Mitchell*, however, it did so in a plurality opinion that did not address that question. Rather, the *Mitchell* plurality invoked the exigent circumstances doctrine *sua sponte*, and applied it to "a narrow but important category of cases: those in which the driver is unconscious and therefore cannot be given a breath test."[109] Before reaching that matter, however, *Mitchell* began with a discussion of *Birchfield* and Wisconsin's implied consent law, which, the plurality noted, was much like that of all other states in that it "deems drivers to have consented to breath or blood tests" on suspicion of DUI and imposes penalties for refusal.[110] The plurality noted that the Court previously had considered the operation of implied consent laws, and it quoted *Birchfield*'s reference to prior approval of civil penalties and evidentiary consequences for test refusal. *Mitchell* added an important caveat:

> But our decisions have not rested on the idea that these laws do what their popular name might seem to suggest—that is, create actual consent to all the searches they authorize. Instead, we have based our decisions on the precedent regarding the specific constitutional claims in each case, while keeping in mind the wider regulatory scheme developed over the years to combat drunk driving. That scheme is centered on legally specified BAC limits for drivers—limits enforced by the BAC tests promoted by implied-consent laws.[111]

---

108    *Mitchell*, 588 U.S. at 846 (plurality) (quoting Petition for *Certiorari*).

109    *Id.* at 843.

110    *Id.* at 844.

111    *Id.* at 846-47.

The *Mitchell* plurality then turned to the grounds for its decision—the exigent circumstances doctrine. Gerald Mitchell was unconscious when he was subjected to a warrantless blood draw, and he was thus unable to undergo a breath test. In such cases, the plurality stated that "the need for a blood test is compelling, and an officer's duty to attend to more pressing needs may leave no time to seek a warrant."[112] The plurality reiterated the importance of the government's need to obtain BAC evidence in order to effectively prosecute DUI offenses and thus to promote highway safety. "The bottom line is that BAC tests are needed for enforcing laws that save lives."[113] When a driver is unconscious, the plurality reasoned, a breath test is unavailable, and a blood test becomes "essential for achieving the compelling interests" served by the regulatory scheme.[114]

Looking back to *Schmerber*, the *Mitchell* plurality noted that the Court there indicated that exigent circumstances existed because the alcohol in the suspect's bloodstream was being metabolized, *and* it took time to transport the suspect to a hospital and to investigate the scene of the car crash. Although acknowledging that the metabolization of BAC evidence does not establish exigent circumstances *per se* under *McNeely*, "*Schmerber* shows that it does so when combined with other pressing needs."[115] The lesson of *Schmerber*, according to the *Mitchell* plurality, is that "exigency exists when (1) BAC evidence is dissipating and (2) some other factor creates pressing health, safety, or law enforcement needs that would take priority over a warrant

---

112    *Id.* at 850-51.

113    *Id.* at 851.

114    *Id.* at 853.

115    *Id.* at 854.

application."[116]  Where in *Schmerber* the "extra factor" was a car crash, in *Mitchell*, the plurality determined, it was Mitchell's unconsciousness.  The plurality noted that a suspect's unconsciousness, whether due to injury or intoxication, is itself a medical emergency that will require treatment in a hospital.[117]  In many cases, the plurality suggested, unconscious drivers will have been involved in crashes, which may require officers to attend to all manner of urgent tasks, like attending to others who could be injured or killed, preserving evidence, or redirecting traffic.  Such "rival priorities would put officers, who must often engage in a form of triage, to a dilemma," forcing them to "choose between prioritizing a warrant application, to the detriment of critical health and safety needs, and delaying the warrant application, and thus the BAC test, to the detriment of its evidentiary value and all the compelling interests served by BAC limits."[118]

Accordingly, the *Mitchell* plurality concluded that, if a police officer has probable cause to suspect DUI, and the suspect's "unconsciousness or stupor requires him to be taken to the hospital or similar facility before police have a reasonable opportunity to administer a standard evidentiary breath test, they may *almost always* order a warrantless blood test to measure the driver's BAC without offending the Fourth Amendment."[119]  Notwithstanding, the plurality stated that it did not "rule out the possibility that in an unusual case a defendant would be able to show that his blood would not have been drawn if police had not been seeking BAC information, and that police could not have

---

[116]    *Id.*

[117]    *Id.* at 854-55.

[118]    *Id.* at 856.

[119]    *Id.* at 857 (emphasis added).

reasonably judged that a warrant application would interfere with other pressing needs or duties."[120]  The plurality remanded to allow Mitchell a chance to make such a showing.

The *Mitchell* plurality consisted of four Justices—Justices Alito, Breyer, and Kavanaugh, and Chief Justice Roberts.  Justice Sotomayor dissented, joined by Justices Ginsburg and Kagan, differing both with the plurality's treatment of the exigent circumstances doctrine and its decision to consider that matter *sua sponte*, particularly given that the government had specifically declined to rely upon exigent circumstances throughout the case.[121]  Justice Gorsuch dissented separately, stating his preference to dismiss the appeal as improvidently granted, rather than considering the exigent circumstances doctrine "solely by self-direction."[122]

Importantly, Justice Thomas concurred in the judgment in *Mitchell*, rejecting the plurality's general guidelines concerning unconscious drivers.[123]  Justice Thomas reiterated the position that he had maintained since *McNeely*—that the natural dissipation of alcohol from the bloodstream categorically constitutes the destruction of evidence, such that a *per se* authorization for all warrantless BAC tests should be recognized under the exigent circumstances doctrine.[124]  Under the *Marks* rule, when the Supreme Court

---

[120]     *Id.*

[121]     *Id.* at 861-78 (Sotomayor, J., dissenting).

[122]     *Id.* at 878 (Gorsuch, J., dissenting).  Justice Gorsuch summed up *Mitchell* succinctly:  "We took this case to decide whether Wisconsin drivers impliedly consent to blood alcohol tests thanks to a state statute.  That law says that anyone driving in Wisconsin agrees—by the very act of driving—to testing under certain circumstances.  But the Court today declines to answer the question presented.  Instead, it upholds Wisconsin's law on an entirely different ground—citing the exigent circumstances doctrine." *Id.*

[123]     *Id.* at 844 (plurality).

[124]     *See id.* at 858-61 (Thomas, J., concurring); *see also Birchfield*, 579 U.S. at 496-99 (Thomas, J., concurring in part and dissenting in part); *McNeely*, 569 U.S. at 176-83 (Thomas, J., dissenting).

of the United States "decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds . . . .'"[125] Because four Justices in *Mitchell* defined a narrow category of cases to which the exigent circumstances exception generally will apply, but Justice Thomas opined that the exigent circumstances doctrine *always* will apply to all BAC testing, the plurality's approach reflects the narrower basis for the decision. Thus, although it is not clear that all portions of *Mitchell* reflect the views of a majority of Justices, the *Mitchell* plurality's central conclusion—the plurality's not-quite-categorical declaration that an unconscious-driver scenario will "almost always" present exigent circumstances—may be treated as a binding proposition of law, as far as it goes.[126] Under the *Mitchell* plurality's reasoning, however, this is a "general rule" dependent upon the specific circumstances, not a *per se* authorization for warrantless blood draws in all such cases.[127]

## B. "Implied Consent"

Merely to recount the details of the Supreme Court's analyses in *McNeely*, *Birchfield*, and *Mitchell* goes a long way toward establishing that statutory "implied consent" cannot serve as an independent, categorical exception to the warrant requirement. In turn, Section 3755 cannot be upheld by reference to the declaration in

---

[125]    *Marks v. United States*, 430 U.S. 188, 193 (1977) (quoting *Gregg v. Georgia*, 428 U.S. 153, 169 n.15 (1976) (plurality)); *see also Commonwealth v. Alexander*, 243 A.3d 177, 197 (Pa. 2020) (citing *Commonwealth v. McClelland*, 233 A.3d 717, 731 (Pa. 2020)) ("We apply the *Marks* rule.").

[126]    *Mitchell*, 588 U.S. at 843, 857 (plurality).

[127]    *Id.* at 844.

Section 1547(a) that people who drive a vehicle in Pennsylvania "shall be deemed to have given consent" to a warrantless blood draw.[128]

Section 3755 concerns the seizure of "blood samples" from a DUI suspect.[129] Blood draws conducted in order to investigate a driver's suspected intoxication are searches under the Fourth Amendment, per *Schmerber*. Searches require warrants, absent an exception to that requirement. *McNeely* holds that warrantless blood searches are not authorized by any categorical understanding of exigent circumstances. *Birchfield* provides a categorical exception for *breath* testing under the search-incident-to-arrest doctrine, but not for blood testing, while still mandating that consent to a blood search be voluntary under the totality of the circumstances. *Mitchell* confined its general rule for unconscious drivers to the exigent circumstances rubric, but made clear that it did not articulate a *per se* rule either. A blood draw conducted under Section 3755 thus remains a warrantless search in search of an exception.

What is unsaid in the Supreme Court's cases is as important as what is said. Nowhere in *Birchfield* did the Court suggest that statutory "implied consent" serves as a stand-alone basis to declare a warrantless search reasonable under the Fourth Amendment. Rather, *Birchfield* discussed the operation of implied consent laws by reference to the consequences that they impose upon refusal. Indeed, "every time that the *Birchfield* Court spoke of 'implied consent,' it referred to these statutory *consequences* of refusal, not to an exception to the Fourth Amendment's warrant requirement."[130] Although the Court in *Mitchell* accepted review of a decision directly holding that statutory

---

[128]    75 Pa.C.S. § 1547(a).

[129]    *Id.* § 3755(a).

[130]    *Bell*, 211 A.3d at 792 (Wecht, J., dissenting) (emphasis in original).

"implied consent" is alone sufficient to dispense with a search warrant,[131] granting *certiorari* specifically to address that fundamental constitutional question, the *Mitchell* plurality conspicuously declined to address the matter. Nonetheless, the *Mitchell* plurality made clear that the Court's prior decisions concerning implied consent laws "have not rested on the idea that these laws do what their popular name might seem to suggest— that is, create actual consent to all the searches they authorize."[132]

As it concerns the constitutional validity of "implied consent" as an exception to the warrant requirement, the *Mitchell* plurality's reasoning was telling. Similarly suggestive is the fact that neither the Commonwealth nor the OAG in this case makes any attempt to suggest that Section 3755 may be upheld due to statutory implied consent. Hunte is the only party to address the matter, and he does so only to ensure that no potential justification for Section 3755 is left open. Moreover, no *amici curiae* sought to intervene in this matter to advance an implied consent argument to this Court. Given the deafening silence in both the Supreme Court's cases and the advocacy of the parties, it is clear that the implied-consent-as-warrant-exception theory effectively has been abandoned and disavowed as a matter of Fourth Amendment jurisprudence—a vestige of a misunderstanding of the law.

Shortly after *Birchfield* (but before *Mitchell*), a plurality of this Court in *Myers* grappled with the meaning of *Birchfield* and *McNeely*, and similarly concluded that implied consent statutes cannot serve as "an independent exception to the warrant requirement," separate from that provided for voluntary consent.[133] Although *Myers* ultimately rested

---

[131]     *See State v. Mitchell*, 914 N.W.2d 151, 157-62 (Wis. 2018), *rev'd*, *Mitchell*, 588 U.S. at 857 (plurality).

[132]     *Mitchell*, 588 U.S. at 846 (plurality).

[133]     *Myers*, 164 A.3d at 1172-73 (plurality).

upon statutory grounds, the plurality there nonetheless rejected the Commonwealth's argument that a warrantless blood draw was authorized under an implied consent theory notwithstanding the application of the statute at issue.[134] The *Myers* plurality noted a post-*McNeely* trend in other jurisdictions toward rejecting implied consent as a stand-alone exception to the Fourth Amendment's warrant requirement.[135] Moreover, the plurality noted, *Birchfield* made clear that the consent exception to the warrant requirement continues to operate under the *Schneckloth* standard, which requires a case-specific showing that consent was provided voluntarily under the totality of the circumstances.[136] The clear implication of developing Fourth Amendment jurisprudence, the plurality concluded, was that a "statute cannot be interpreted to authorize a search, deemed to operate under the consent exception to the warrant requirement, if the search would not otherwise be justified by that exception. Simply put, statutorily implied consent cannot take the place of voluntary consent."[137] The subsequent discussion of implied consent laws in *Mitchell* all but confirmed this conclusion. Decisional law in other states further suggests the accuracy of the *Myers* plurality's assessment; indeed, the writing effectively has been on the wall since *McNeely*.[138]

---

[134] Then-Justice, now-Chief Justice Todd joined only the statutory component of *Myers*, finding it sufficient to dispose of the case without consideration of any constitutional issue. *See id.* at 1184 (Todd, J., concurring).

[135] *See id.* at 1173-76 (plurality).

[136] *See Birchfield*, 579 U.S. at 478 (noting that "voluntariness of consent to a search must be 'determined from the totality of the circumstances'") (quoting *Schneckloth*, 412 U.S. at 227); *Myers*, 164 A.3d at 1178 (plurality) ("*Birchfield* in no way suggests that the existence of a statutory implied consent provision obviates the constitutional necessity that consent to a search must be voluntarily given, 'and not the result of duress or coercion, express or implied.'") (quoting *Schneckloth*, 412 U.S. at 248).

[137] *Myers*, 164 A.3d at 1177-78 (plurality).

[138] *See, e.g.*, *State v. Prado*, 960 N.W.2d 869 (Wis. 2021) (declaring Wisconsin's incapacitated driver provision unconstitutional), *id.* at 879 ("In the context of warrantless (continued…)

The United States Constitution is "the supreme Law of the Land."[139]  As the *Myers* plurality reasoned, a state statute "cannot authorize what the Fourth Amendment . . . would prohibit."[140]  In the end, "implied consent" is a constitutionally meaningless phrase in this context.  It is nothing more than a "popular name."[141]  The statutes that are so called do not create consent in the constitutional sense, which must be provided voluntarily under the totality of the circumstances.[142]  "Implied consent" laws cannot waive the protections of the Fourth Amendment for the entire class of people who drive cars.  Rather, such statutes demand submission to a search by imposing consequences upon refusal.[143]  It does not matter what they are called.

---

blood draws, consent 'deemed' by statute is not the same as actual consent, and in the case of an incapacitated driver the former is incompatible with the Fourth Amendment."); *id.* at 881 (incapacitated driver provision's "'deemed' consent authorizes warrantless searches that do not fulfill any recognized exception to the warrant requirement and thus the provision violates the Fourth Amendment's proscription of unreasonable searches").

A prominent commentator on Fourth Amendment jurisprudence has discussed state court decisions holding that implied consent statutes are "not substitutes for a warrant or legal exceptions to the Fourth Amendment warrant requirement," and has opined that such decisions are clearly correct, suggesting that "a rule to the contrary would in effect nullify the Supreme Court's decision in *McNeely*," that "[n]othing in the more recent *Birchfield* decision casts any doubt upon that conclusion," and that the *Mitchell* plurality made clear that prior decisions have not held otherwise.  2 WAYNE R. LAFAVE ET AL., CRIMINAL PROCEDURE § 3.10(b) (4th ed.) (discussing *McNeely*, *Birchfield*, *Mitchell*, *Aviles v. State*, 443 S.W.3d 291 (Tex. App. 2014), *Flonnory v. State*, 109 A.3d 1060 (Del. 2015); *State v. Halseth*, 339 P.3d 368 (Idaho 2014); *Byars v. State*, 336 P.3d 939 (Nev. 2014); *State v. Fierro*, 853 N.W.2d 235 (S.D. 2014); *State v. Wells*, 2014 WL 4977356 (Tenn. Crim. App. 2014) (unreported)).

[139]    U.S. CONST. art. VI, cl. 2.

[140]    *Myers*, 164 A.3d at 1173 (plurality).

[141]    *Mitchell*, 588 U.S. at 846 (plurality).

[142]    *See Schneckloth*, 412 U.S. at 248-49.

[143]    *See Myers*, 164 A.3d at 1177 (plurality) ("[Section 1547] does not authorize police officers to seize bodily fluids without an arrestee's permission.  Instead, it imposes an (continued…)

The threat of penalties for refusal is the hallmark of implied consent laws, but it is the antithesis of actual consent. *Schneckloth* makes clear that a sufficient showing of consent to a search requires the government to "demonstrate that the consent was in fact voluntarily given, and not the result of duress or coercion, express or implied."[144] *Birchfield* specifically invoked *Schneckloth*'s voluntariness standard in its remand instructions,[145] yet it simultaneously spoke approvingly of implied consent laws that "impose civil penalties and evidentiary consequences on motorists who refuse to comply," stressed that such laws were not challenged in the case before it, and noted that nothing in its opinion "should be read to cast doubt on them."[146] This language suggests that, notwithstanding that a typical implied consent scenario plainly involves coercion—a lengthy driver's license suspension is a significant consequence to many—the consent given can be satisfactory for Fourth Amendment purposes so long as criminal penalties are not attached to the refusal to submit to a blood test.[147]

In *Bell*, this Court upheld the lawfulness of the "evidentiary consequence" of refusal to submit to a warrantless blood draw—use of the refusal as evidence at a later DUI trial—

---

ultimatum upon the arrestee, who must choose either to submit to a requested chemical test or to face the consequences that follow from the refusal to do so.").

[144] *Schneckloth*, 412 U.S. at 248.

[145] *See Birchfield*, 579 U.S. at 478 (quoting *Schneckloth*, 412 U.S. at 227).

[146] *Id.* at 476-77.

[147] As the *Birchfield* Court made clear, the "voluntary consent" rubric is entirely inapplicable to *breath* testing because that form of warrantless testing is categorically authorized by the search-incident-to-arrest doctrine, and the refusal to comply may be penalized "just as a State may make it a crime for a person to obstruct the execution of a valid search warrant." *Birchfield*, 579 U.S. at 455. Refusal to submit to a breath test, thus, "may be prosecuted as such," not because the subject refused to provide voluntary consent, but rather because the refusal obstructs the execution of a valid search incident to arrest, and the subject has "no right to refuse it." *Id.* at 475, 478. The questions that fall within the gray area in *Birchfield*'s discussion of implied consent laws relate solely to warrantless blood draws, where a constitutional right to refuse consent is germane.

stressing the need to give effect to *Birchfield*'s admonition that its holding was not meant to cast doubt upon the lawfulness of that consequence.[148]  Consequently, as it concerns blood testing specifically, unless and until instructed otherwise by the Supreme Court of the United States, we must regard that Court's treatment of implied consent regimes as *sui generis*, approving a limited exception to the general rule that consent to a search much be given free from the threat of penalty for refusal, so long as those consequences do not extend to criminal punishment for refusing a warrantless blood draw.[149]

The unique and technical constitutional doctrine that implied consent laws have spawned, however, does not make Section 3755 any less unconstitutional.  Consent to a search must be given voluntarily, and this assessment is made case-by-case under the totality of the circumstances—not as a categorical matter.[150]  The clear implication of *McNeely*, *Birchfield*, and *Mitchell* is that implied consent statutes provide no legitimate, categorical justification for warrantless searches of any variety—breath or blood. Regardless, Section 3755 concerns blood testing, which undoubtedly implicates the heightened privacy concerns discussed thoroughly in *Birchfield*, and is subject to no categorical exception from the Fourth Amendment's warrant requirement.  Section 3755,

---

[148]     *See Bell*, 211 A.3d at 775-76 (upholding constitutionality of 75 Pa.C.S. § 1547(e)).

[149]     This is similarly true of the unconstitutional conditions doctrine, which, the Supreme Court of the United States has explained, "vindicates the Constitution's enumerated rights by preventing the government from coercing people into giving them up."  *Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 604 (2013); *see also Bell*, 211 A.3d at 784-86 (Wecht, J., dissenting) (discussing unconstitutional conditions doctrine in context of implied consent law); Hunte's Br. at 21-24.  Due to the relevant language in *Birchfield* and this Court's understanding of its significance in *Bell*, until instructed otherwise, we must similarly regard *Birchfield* as approving a limited carveout from this doctrine, where it concerns the imposition of civil penalties and evidentiary consequences upon the refusal to submit to a warrantless blood draw.

[150]     *Birchfield*, 579 U.S. at 478; *Schneckloth*, 412 U.S. at 248-49.

moreover, provides no right to refuse consent to a blood draw, nor does it concern any consequences of refusal; refusal facially is not an option.

Section 3755 simply mandates warrantless searches, and it requires no demonstration of any case-specific exception to the warrant requirement. "Implied consent" is not such an exception, and it does not rescue Section 3755 from its facial constitutional defects.

## C. Exigent Circumstances

Although the Commonwealth and the OAG dedicate most of their arguments to assertions of exigent circumstances in this case, this contention is not relevant to the constitutionality of Section 3755. Section 3755 requires no assertion of exigent circumstances as a prerequisite to a blood draw. Regardless of whether a demonstration of exigent circumstances separately would have dispensed with the need for a search warrant in this case—or in any other—this neither alters the language of the statute nor cures its constitutional deficiencies.

The blood draw at issue in this case was conducted under the authority of Section 3755. To the extent that the Commonwealth asserts exigent circumstances as an alternative basis to uphold the specific search in this case, the Commonwealth's argument is waived due to its failure to raise the matter below.[151] There is a straightforward reason that the Commonwealth made no attempt below to establish a case-specific exigency—this case proceeded under Section 3755. All involved—Trooper

---

[151] *See* Pa.R.A.P. 302(a) ("Issues not raised in the trial court are waived and cannot be raised for the first time on appeal."); *see also Commonwealth v. Wolfel*, 233 A.3d 784 (Pa. 2020) (holding that Commonwealth failed to preserve challenge to the trial court's analysis under the Pennsylvania Constitution); *id.* at 790 ("Notably—upon the Commonwealth's entreaty—this Court recently enforced waiver against a criminal defendant for failing to properly raise and preserve a *Birchfield*-related issue. Here, we afford evenhanded treatment to the Commonwealth.") (citing *Commonwealth v. Hays*, 218 A.3d 1260, 1266-67 (Pa. 2019)).

German, Hunte, the Commonwealth, and the trial court—understood that the blood draw here was conducted under Section 3755, not pursuant to a case-specific showing that it was impracticable to obtain a search warrant. No such showing ever was made.

The Commonwealth's waiver, however, is irrelevant to our discussion. To the extent that the Commonwealth's and OAG's arguments concerning exigent circumstances are intended to bear upon the constitutionality of Section 3755, we consider them on their own terms, but find no merit. The Commonwealth and OAG assert that this case is governed by the exigent circumstances doctrine in order to establish either a fact-specific basis to avoid ruling upon the constitutionality of Section 3755, or perhaps, as the OAG suggests, grounds for upholding the statute due to some overlap between situations to which Section 3755 applies and those discussed in *Mitchell*. The suggestion is that, where exigent circumstances are present, Section 3755 can be applied in a manner that would comply with the Fourth Amendment, such that the statute cannot be held facially unconstitutional in all its applications.

First, there is no justification to conclude that Section 3755 is constitutional simply because some percentage of cases to which it applies will also involve unconscious motorists or other exigencies described in the *Mitchell* plurality opinion. Although there will be some inevitable overlap, Section 3755 is not limited to the unconscious-driver scenario discussed by the *Mitchell* plurality. Rather, Section 3755 applies to all drivers who require "medical treatment in an emergency room of a hospital" due to a "motor vehicle accident," where "probable cause exists" to suspect DUI.[152] Indeed, the statute covers many more persons than just the actual driver; it is "applicable to all injured occupants who were capable of motor vehicle operation if the operator . . . cannot be

---

[152] 75 Pa.C.S. § 3755(a).

determined."[153] On its face, Section 3755 covers a far broader class of persons than the "narrow" category of unconscious drivers addressed by the *Mitchell* plurality's "general rule."[154] Moreover, the *Mitchell* plurality made clear that its general rule was not, in fact, a *per se* rule—"almost always" is not the same as "always."[155] Section 3755, by contrast, purports to provide a categorical authorization for warrantless blood draws. No such authority may be found in *Mitchell*, or in any other precedent.

More fundamentally, when addressing a facial constitutional challenge to a statute under the Fourth Amendment, "the proper focus of the constitutional inquiry is searches that the law actually authorizes, not those for which it is irrelevant."[156] The *Patel* Court further explained:

> If exigency or a warrant justifies an officer's search, the subject of the search must permit it to proceed irrespective of whether it is authorized by statute. Statutes authorizing warrantless searches also do no work where the subject of a search has consented. Accordingly, the constitutional "applications" that petitioner claims prevent facial relief here are irrelevant to our analysis because they do not involve actual applications of the statute.[157]

Similarly here, where the Commonwealth and OAG suggest that Section 3755 can be applied constitutionally because there may be specific situations in which a warrantless blood draw is necessitated by exigent circumstances, the Commonwealth and OAG are no longer discussing Section 3755 at all. A case-specific showing of exigent circumstances relies upon no statutory authority for its constitutional validity. That is, if

---

[153]  *Id.*

[154]  *Mitchell*, 588 U.S. at 843-44.

[155]  *Id.* at 843, 857.

[156]  *Patel*, 576 U.S. at 418.

[157]  *Id.* at 418-19.

the blood draw in this case were justified by exigent circumstances, then the search would be justified by those exigent circumstances, not by Section 3755. Where the statute is invoked, as it was in this case, that is a wholly separate and distinct source of authority. But problematically for Section 3755, the authority that it purports to provide is, in fact, unconstitutional. We need not blind ourselves to this fact merely because lawful warrantless searches may be conducted in situations that are "irrelevant" to Section 3755 because they "do not involve actual applications of the statute."[158]

The Supreme Court of Wisconsin similarly assessed an identical suggestion in *Prado* when striking down Wisconsin's incapacitated-driver statute—that State's version of Section 3755:

> [T]he determination of whether there were exigent circumstances does not involve any application of the incapacitated driver provision. In other words, if the State relies on exigent circumstances to justify a search, it is not relying on the statute. *See* [*State v. Prado*, 947 N.W.2d 182, 202 (Wis. Ct. App. 2020)] ("If a court ultimately determines that such a search is constitutional in any given case, it will be on the basis of an exception such as exigent circumstances, not on the basis of anything set forth in the implied consent statute itself."). Searches of unconscious drivers may almost always be permissible as the State contends, but then they are almost always permissible under the exigent circumstances exception to the warrant requirement pursuant to the *Mitchell* plurality, not under the statute.[159]

Additionally, to borrow from Justice Sotomayor's *Mitchell* dissent:

> The Court granted *certiorari* to answer "[w]hether a statute authorizing a blood draw from an unconscious motorist provides an exception to the Fourth Amendment warrant requirement." The answer to that question is no. Whether exigent circumstances nevertheless require that the warrantless blood draw be upheld is an independent issue.[160]

---

158    *Id.* at 418-19.

159    *Prado*, 960 N.W.2d at 879.

160    *Mitchell*, 588 U.S. at 870 n.5 (Sotomayor, J., dissenting).

To be clear, it may very well be that the circumstances of this case could have independently established that the seizure of Hunte's blood was justified by an exigency, along the lines of that discussed by the *Mitchell* plurality. But this argument is not only waived, it is irrelevant. Hunte's blood was seized pursuant to Section 3755. A case-specific showing of exigent circumstances—which is not necessitated by the statute—provides a wholly distinct, constitutional authority. Such a showing, had it been made, would not establish a constitutional "application" of Section 3755; it would establish that the statute did not apply at all. Here, Section 3755 did apply.

Accordingly, the Commonwealth's and OAG's arguments concerning exigent circumstances present no obstacle to our consideration of the constitutionality of Section 3755, and they do not establish that Section 3755 was validly and constitutionally applied, in this case or in any other.

### D. Subsequently Obtained Search Warrants

The final suggestion that Section 3755 should be spared constitutional scrutiny derives from the Commonwealth's emphasis upon the two search warrants that the troopers in this case obtained *after* the relevant blood draw—one warrant to obtain the earlier-drawn samples and a second to have those samples tested. The deficiency in this suggestion is the same as that inherent in the suggestion of exigent circumstances. On its face, Section 3755 requires no search warrant at all—neither at the time of the blood draw nor at any time thereafter. A subsequently obtained search warrant does nothing to cure the statute's facial authorization of a warrantless search. Rather, if a search warrant is obtained in a given case—which is by no means a certainty under the plain language of Section 3755—it provides a law enforcement officer with authority separate from the statute, *i.e.*, the constitutional authority that always accompanies a search warrant. "If exigency or a warrant justifies an officer's search, the subject of the search

must permit it to proceed irrespective of whether it is authorized by statute."[161] Reliance upon a search warrant is altogether different from reliance upon Section 3755. And as discussed repeatedly above, the blood draw in this case was conducted solely under the purported authority of Section 3755.

Like the arguments concerning the exigent circumstances doctrine, the Commonwealth's argument concerning the subsequently issued search warrants is immaterial to the constitutionality of Section 3755. Because Section 3755 facially requires no search warrant and no assertion of exigent circumstances, these purported justifications are "irrelevant to our analysis because they do not involve actual applications of the statute."[162] To the extent that the Commonwealth and the OAG argue that Section 3755 is constitutional because it does not *preclude* a law enforcement officer from obtaining a search warrant, this suggestion is plainly meritless.[163] The constitutional problem is that the statute does not *require* a search warrant. At bottom, whether in regard to the exigent circumstances argument or that concerning the later-issued search warrants, the Commonwealth's and OAG's positions reduce to the assertion that Section 3755 is constitutional only when it is not actually applied.

The Commonwealth additionally suggests that Section 3755 may be understood as merely authorizing hospital personnel to draw blood prior to receiving a search warrant, and that a subsequently obtained search warrant ensures that law enforcement officers

---

[161] *Patel*, 576 U.S. at 418-19.

[162] *Id.* at 419.

[163] *See* Commonwealth's Br. at 14 ("Nothing in the statute prohibits law enforcement from obtaining a search warrant to seize the blood sample at a later date . . . ."); OAG's Br. at 10 ("[W]hile the statute requires probable cause, it does not require a warrant. But neither does it preclude one. Where the police do obtain a warrant, applying § 3755 would be constitutional.").

obtain the blood samples lawfully.[164] This is not what Section 3755 says; again, the statute facially requires no search warrant at any point, whether before or after the blood draw. Just as importantly, the Commonwealth's position disregards that the initial intrusion into the body is unquestionably significant for Fourth Amendment purposes. As *McNeely* made clear, a "compelled physical intrusion" to extract blood is an "invasion of bodily integrity" that "implicates an individual's 'most personal and deep-rooted expectations of privacy.'"[165] Moreover, although *Birchfield* is an opaque decision in certain respects, on this point the *Birchfield* Court could not have been more clear: blood draws are highly intrusive upon individual privacy interests, and, compared to breath testing, there is "no satisfactory justification for demanding the more intrusive alternative without a warrant."[166] Contrary to the Commonwealth's position, the physical intrusion into the body itself is a constitutionally significant search, regardless of the treatment of the samples after the fact. Thus, as it concerns the constitutionality of Section 3755, the Commonwealth's argument about the subsequently obtained search warrants is not responsive to the constitutional problem.

### E. Position of the Concurring and Dissenting Opinions (the "Dissents")

Our dissenting colleagues make the same analytical error as the Commonwealth and the OAG. Justice Brobson contends that Section 3755 "can be applied in a

---

[164] Commonwealth's Br. at 13 (Section 3755 "outlines the limited circumstances where emergency room personnel may draw blood, prior to receiving a search warrant, and later provide it to law enforcement").

[165] *McNeely*, 569 U.S. at 148 (quoting *Winston v. Lee*, 470 U.S. 753, 760 (1985)); *see also id.* at 159 (plurality) ("We have never retreated . . . from our recognition that any compelled intrusion into the human body implicates significant, constitutionally protected privacy interests."); *id.* at 174 (Roberts, C.J., concurring in part and dissenting in part) ("We have already held that forced blood draws can be constitutional . . . but that does not change the fact that they are significant bodily intrusions.").

[166] *Birchfield*, 579 U.S. at 474.

constitutional manner" because "nothing within the plain text of Section 3755 forecloses a situation where either law enforcement obtains a warrant" for a blood draw or "the Commonwealth later establishes by a preponderance of the evidence that the warrantless seizure of a person's blood fell within an exception to the warrant requirement."[167] Justice Mundy agrees with this suggestion.[168]

As discussed at length above, the Dissents endorse precisely the line of reasoning that the Supreme Court of the United States expressly rejected in *Patel*. We once again emphasize *Patel*'s straightforward rationale. The purported "constitutional applications" of Section 3755 that the Dissents imagine are those in which a blood draw would be authorized by a wholly distinct source of authority that has nothing to do with Section 3755, *i.e.*, a search warrant or the demonstration of a valid exception to the warrant requirement. These are exactly the sort of hypotheticals that are, as the U.S. Supreme Court said in *Patel*, "irrelevant to our analysis because they do not involve actual applications of the statute."[169] The Dissents contend that the statute is constitutional so long as it is not actually applied. The infirmity of the Dissents' position should be apparent on its own terms, but *Patel* makes it impossible to overlook.

Justice Brobson further suggests that Section 3755 does not actually purport to authorize a warrantless search because it is "addressed not to law enforcement but, rather, to medical professionals."[170] This disregards the substance of the law. Section 3755 unambiguously purports to authorize a blood draw on the basis of "probable cause"

---

[167]    Conc. & Diss. Op. (Brobson, J.) at 6.

[168]    Conc. & Diss. Op. (Mundy, J.) at 1.

[169]    *Patel*, 576 U.S. at 419.

[170]    Conc. & Diss. Op. (Brobson, J.) at 5.

to suspect DUI,[171] and it mandates that the blood samples be tested and the results turned over to governmental officials upon request (for use in a criminal prosecution, as happened in this case). Such a blood draw indisputably is a search within the meaning of the Fourth Amendment, yet the statute requires neither a search warrant nor any demonstration of a valid exception to the warrant requirement. As Justice Brobson concedes, this is "constitutionally problematic."[172] And it remains "constitutionally problematic" notwithstanding the unsurprising and, indeed, intuitive fact that medical personnel, rather than law enforcement, actually perform the act of drawing the blood.

Neither Dissent makes any attempt to establish that the warrantless searches contemplated by Section 3755 are constitutional under any recognizable exception to the warrant requirement. Neither Dissent articulates any theory sounding in exigent circumstances, so-called "implied consent," or otherwise. While Justice Brobson frankly concedes the infirmity of the statute, as commonly understood and applied by law enforcement officers and courts across Pennsylvania, both Dissents labor nonetheless to overlook the facial unconstitutionality of Section 3755. They do so solely by invoking circumstances in which the evidence that the statute contemplates could be obtained by other means. This is precisely what *Patel* instructs us *not* to do. The law could not be more clear in this regard.

Under the Dissents' approach, Section 3755 would be wholly immune from constitutional scrutiny, as would every other conceivable statute that purports to authorize a warrantless search or seizure.[173] There would be no such thing as a facial constitutional

---

[171]    75 Pa.C.S. § 3755(a).

[172]    Conc. & Diss. Op. (Brobson, J.) at 5.

[173]    *See Patel*, 576 U.S. at 418 (noting that such "logic would preclude facial relief in every Fourth Amendment challenge to a statute authorizing warrantless searches," and "[f]or this reason alone," the "argument must fail").

challenge under the Fourth Amendment. Consider a hypothetical statute authorizing police officers to routinely enter and search people's homes without a search warrant—an action that would be plainly unconstitutional under the Fourth Amendment and Article I, Section 8 of the Pennsylvania Constitution. Under the logic of the Dissents, such a statute could never be declared facially unconstitutional (*i.e.*, unconstitutional in all of its applications), because there could be circumstances where the officers obtain a search warrant even though the statute does not require them to do so. Such reasoning is precisely what the *Patel* Court's discussion was meant to foreclose.

One always could imagine a scenario where the contemplated evidence could be obtained with a search warrant or a showing of exigent circumstances. This does not establish a constitutional "application" of Section 3755; rather, it hypothesizes a scenario in which the statute does not apply at all. As *Patel* instructs, "the proper focus" of our constitutional inquiry is upon the "searches that the law actually authorizes, not those for which it is irrelevant."[174] When applied on its own terms, without adding language to the statute or hypothesizing irrelevant fact patterns, the searches contemplated by Section 3755 remain constitutionally deficient. This is true in every scenario in which Section 3755 applies as written.

**V.**

Section 3755 purports to authorize warrantless searches of blood in the absence of any legitimate exception to the Fourth Amendment's warrant requirement. As the foregoing discussion makes clear, neither the exigent circumstances doctrine nor consent—actual or "implied"—provides the categorical authority that the statute claims. Thus, Section 3755 is clearly, plainly, palpably, and indeed, facially unconstitutional under

---

[174] *Id.*

the Fourth Amendment.[175]  Moreover, because the "Fourth Amendment rulings of the Supreme Court of the United States" provide "the baseline for the protections afforded by Article I, Section 8 of the Pennsylvania Constitution," Section 3755 violates the Pennsylvania Constitution as well.[176]  This is so notwithstanding any prior approval of Section 3755 that our decisions have suggested in decades past, before the changes to Fourth Amendment doctrine brought about by *McNeely* and its progeny.[177]

Section 3755(a) is the offending provision, but the trial court's order covers Section 3755(b) as well.  This was not error, because Section 3755(b) is wholly reliant upon Section 3755(a), and the provisions plainly are not severable.  Section 3755(b) requires hospital personnel to comply with the mandate of subsection (a), and it provides them with civil and criminal immunity for performing the blood draws.  Subsection (b), however, provides this immunity only for conducting blood draws "pursuant to this section" or performing "any other duty imposed by this section."[178]  Without the mandate of Section

---

[175]  In light of our conclusion, we need not address the Commonwealth's third issue as stated, in which the Commonwealth argues that the trial court should not have dismissed the charges that were premised upon Hunte's blood draw.  The Commonwealth's argument on this score is based solely upon its assertion that the trial court erred in declaring Section 3755 unconstitutional.  The trial court did not err.

[176]  *Wolfel*, 233 A.3d at 789-90.

[177]  *See Riedel*, 651 A.2d at 140-42; *Commonwealth v. Shaw*, 770 A.2d 295, 297-99 (Pa. 2001).

[178]  *See* 75 Pa.C.S. § 3755(b) ("No physician, nurse or technician or hospital employing such physician, nurse or technician and no other employer of such physician, nurse or technician shall be civilly or criminally liable for withdrawing blood or obtaining a urine sample and reporting test results to the police pursuant to this section or for performing any other duty imposed by this section.  No physician, nurse or technician or hospital employing such physician, nurse or technician may administratively refuse to perform such tests and provide the results to the police officer except as may be reasonably expected from unusual circumstances that pertain at the time of admission.").

3755(a), which is unconstitutional, Section 3755(b) has no application. Accordingly, the trial court did not err in declaring Section 3755 unconstitutional in its entirety.[179]

Some may have concern that, absent the mandate and the immunity provided in Section 3755(b), hospital personnel might be resistant to law enforcement requests to conduct blood draws in the situations to which Section 3755 applies.[180] The possibility of such challenges, however, cannot overcome the fact that Section 3755(a) is facially unconstitutional. In any event, there is no reason that the General Assembly could not enact a law that would require hospital personnel to comply with a lawful law enforcement

---

[179] Justice Mundy differs, reasoning that we have identified "absolutely nothing unconstitutional" about the provision of immunity to medical personnel in Section 3755(b). Conc. & Diss. Op. (Mundy, J.) at 2. This misses the point. As explained further below, there is, indeed, nothing unconstitutional about the General Assembly's policy determination that medical personnel should enjoy civil and criminal immunity for assisting law enforcement in obtaining blood samples for use in DUI investigations. As written, however, Section 3755(b) has no application absent the unconstitutional mandate of Section 3755(a). With regard to subsection (b), the issue is not its constitutionality, but rather its nonseverability. Contrary to Justice Mundy's portrayal, the immunity provided in subsection (b) is not a freestanding grant to "medical personnel complying with requests from law enforcement to draw blood from suspected intoxicated drivers." *Id.* Rather, the immunity is tethered specifically to the provision that purports to authorize unconstitutional searches. Without Section 3755(a), Section 3755(b) makes no sense.

In any event, Justice Mundy's suggestion that Section 3755(b) may be salvaged is premised upon the notion that there are "situations where Section 3755(a) can be applied constitutionally, such as when law enforcement obtains a warrant or an exception to the warrant requirement is later determined by a court to apply." *Id.* As explained in detail above, this position is plainly erroneous under the Supreme Court of the United States' decision in *Patel*, which Justice Mundy does not discuss or acknowledge.

[180] *See* OAG's Post-Submission Memorandum, 5/16/2024, at 2-3 (arguing that, without Section 3755(b), "medical personnel would have no obligation or incentive to perform a blood draw, and they would be deterred from doing so by the risk of potential liability").

request for a blood draw and provide them with immunity accordingly, much the same as that provided in Section 3755(b) and Section 1547(j).[181]

To that end, it is worth stressing that compliance with the Fourth Amendment's requirements in this area would not require an approach that differs dramatically from existing practice under Section 3755. One could imagine, for example, a statute that requires hospital personnel to comply with, and provides immunity for, a request for a blood draw where the requesting officer certifies that he or she has probable cause to suspect DUI and: (1) has obtained a search warrant; or (2) is unable to obtain a search warrant under the circumstances. A hospital form not unlike the one that Trooper German used in this case could provide a space for such a certification. Should the suspect ultimately be charged with DUI and seek suppression of the blood test results, the Commonwealth would be able to rely upon the search warrant, or could make a case-specific showing of exigent circumstances if a warrantless blood draw was necessary. Indeed, if the requesting officer hypothetically "checked the box" indicating that he or she was relying upon exigent circumstances for the blood draw, then the government already would be beginning to build a record to later prove that assertion in court, if necessary.

Thus, even if the potential for some practical difficulties was relevant to the constitutionality of Section 3755, which it is not, such challenges are not insurmountable. There is little reason for concern that satisfying the Fourth Amendment in cases such as this one will prove to be particularly burdensome for law enforcement or lead to any

---

[181] *See* 75 Pa.C.S. § 1547(j) ("No physician, nurse or technician or hospital employing such physician, nurse or technician, and no other employer of such physician, nurse or technician shall be civilly liable for withdrawing blood and reporting test results to the police at the request of a police officer pursuant to this section. No physician, nurse or technician or hospital employing such physician, nurse or technician may administratively refuse to perform such tests and provide the results to the police officer except as may be reasonably expected from unusual circumstances that pertain at the time the request is made.").

appreciable reduction in the effectiveness of DUI investigations. This is especially true where there are undoubtedly ways that the General Assembly could remedy any foreseeable difficulties through appropriate legislation, free from the facial unconstitutionality of Section 3755.[182]

What the General Assembly cannot do, however, is subject the people to unconstitutional searches by legislative fiat. Section 3755 is facially unconstitutional under the Fourth Amendment to the United States Constitution and Article I, Section 8 of the Pennsylvania Constitution.

The order of the Court of Common Pleas of Cumberland County is affirmed.

Chief Justice Todd and Justices Donohue, Dougherty and McCaffery join the opinion.

Justice Mundy files a concurring and dissenting opinion.

Justice Brobson files a concurring and dissenting opinion in which Justice Mundy joins.

---

[182] To be clear, we are not in any way "requiring the legislature to enact" any law, as Justice Mundy suggests. Conc. & Diss. Op. (Mundy, J.) at 3. The example that we discuss here is merely illustrative of means that the General Assembly could employ, if it so wishes, to provide medical personnel with immunity without categorically mandating unconstitutional, warrantless intrusions into people's bodies.